CLARK *v.* BUSSARD.

1. REFORMATION OF INSTRUMENTS—LAND CONTRACTS—VENDOR AND PURCHASER—MISTAKE OF SCRIVENER.

In a suit to reform a land contract in which the scrivener in describing the premises conveyed erroneously used the word "east" instead of "west," which was undetected by the vendor or vendee until after the latter had assigned his interest to another, the finding of the court below that said assignee was not an innocent purchaser, *held*, justified by the evidence.

2. VENDOR AND PURCHASER—LAND CONTRACTS—RIGHTS OF ASSIGNEE.

An assignee of a land contract does not acquire the legal title to any property it purports to convey, but only an equitable right of purchase subject to any equities existing between the original parties.

Appeal from Kalamazoo; Weimer (George V.), J. Submitted June 13, 1922. (Docket No. 80.) Decided October 2, 1922.

Bill by Jeanie Clark against Ross B. Bussard and A. Merle Carpenter for the reformation of a land contract. From a decree for plaintiff, defendant Carpenter appeals. Affirmed.

*Fred A. Mills* (*Lincoln H. Titus,* of counsel), for plaintiff.

*Jackson, Fitzgerald & Dalm,* for appellant.

STEERE, J. Plaintiff filed this bill to reform a land contract given by her to defendant Bussard, and to restrain defendant Carpenter from erecting a structure on certain premises claimed by him as assignee of said contract. The property involved is a part of lot 17 of

Stone & Phillips' addition to the village (now city) of
Kalamazoo. This addition is in form a right-angle tri-
angle bounded on the west by Elm street and north
by Kalamazoo street, which cross each other at right
angles, and on the southeast by the Michigan Central
railroad right of way which forms the hypothenuse of
the triangle; 264 feet south of Kalamazoo street and
parallel to it Eleanor street extends from Elm street
west through the addition to the railroad. Lot 17
lies partially triangular shaped, at the north side of
the east end of Eleanor street, on which it fronts 38
feet and extends northeasterly along the railroad prop-
erty 199 feet to an acute angle formed by the railroad
line and its north boundary, which extends west from
that point 186½ feet, forming at its west end a right
angle with the west line of 17 which extends south
from that point 132 feet to Eleanor street.

Plaintiff owned adjoining lots 3 and 4, each 66x132
feet in dimensions fronting north on Kalamazoo street,
their rear line being along that portion of lot 17 lying
directly south of them. Lot 4 lies west of 3 and its
western boundary is in line with that of lot 17. A
brick dwelling house is located on lot 4, and plain-
tiff resided in a house on lot 3, with a barn at the
rear and a driveway between the two lots extending
south from Kalamazoo street to the railroad line and
a short distance along it diagonally southwest to
Eleanor street. On June 20, 1919, she entered into
an agreement with Bussard to sell him lot 4 and that
part of lot 17 lying directly south of it for $5,000,
reserving the driveway for their common use, on pay-
ment of $1,000 down and the balance in deferred
monthly payments of $30 each with interest. A land
contract was prepared embodying those terms as they
supposed and signed by the parties. But by an error
of the scrivener who drew the contract, unnoticed by
the parties at the time, in writing "east" instead of

220—Mich.—20.

"west" he included the part of lot 17 lying back of plaintiff's house in the description, and swung the driveway from where it was located to the other side of plaintiff's lot as follows:

"Lot four (4) and that part of lot seventeen (17) lying west of a continuation of the east line of lot three (3), excepting that said first party hereto reserves to herself, her heirs and assigns, the use, for driveway purposes, with said second party hereto, his heirs and assigns, a strip of land six and one-half (6½) feet wide off and from the east side of the lands herein described, and along railway line to the street on the south," etc.

Bussard paid the $1,000 down and took possession of lot 4 with that portion of 17 directly south of it. He fixed up the property, electrified the house, did some wall papering in it and put a new roof upon it, cut brush along the fence, cleared up and plowed the portion of lot 17 back of lot 4 and west of the driveway, which he recognized as his eastern boundary, and did not take possession of or make any claim to any land west of the driveway. He moved upon the premises and resided there until after October 14, 1920, when he sold his interest in the property and assigned his land contract to defendant Carpenter.

That there was a mutual mistake between plaintiff and Bussard in executing the contract with the description as drawn is undisputed, and it was promptly so admitted by Bussard when advised of it. Their testimony is in harmony as to just what property she sold and he bought. The party who drew up the contract confirms their testimony as to what the agreement was as he heard it, and states he went down to plaintiff's house to talk the matter over, "and the way the contract was to be drawn;" that "they all came out of the house and went down the driveway and looked the property over and talked with Mr. Bussard about it before the papers were drawn. He wanted to be

satisfied where the curb would be set." While testifying definitely that Bussard was to get lot 4 and "the west portion of lot 17 west of the west continuation of lot number 3," he had no explanation of how he came to write *east* line of lot 3 instead of *west.*

Carpenter was a dealer in building supplies and a builder. He put a new roof on the house for Bussard in the spring of 1920, talked with him then about the property and when told by Bussard he got it for $5,000 remarked, as Bussard testified, "he would like to have bought it for that." Later in the summer Bussard concluded he would like to sell the property and offered Carpenter lot 4 with the house upon it for $5,000, but on Carpenter replying he would not take it without the back lot Bussard offered him, as he states, "all I owned, 4x16 rods," for $6,000, which Carpenter finally accepted. During the negotiations Carpenter looked over the property. He admits, "I asked him about the lines of the property, not in exact words but in a general way," states that Bussard said to him in substance, "you could use this back lot nicely—you could unload cars there"—but claims that he understood from what Bussard told him, confirmed by the description in the papers, he was buying all of lot 17 back of lots 3 and 4. Bussard, who at that time had no knowledge of any defect in the description, testified positively to telling Carpenter his property was 4 rods wide and 16 rods deep running back to Eleanor street and the railroad except the west corner at the back, cut off by the diagonal, at the railroad which Carpenter saw, and that he explained to him where the lines went, saying in part:

—"we went first to look at the curb and I explained the matter to him, then we walked through to the back and looked up through there about 3 feet east of a telephone pole which would be about straight south of the curb, * * * Mr. Carpenter came out here on the railroad track, and first we went down Eleanor

street. * * * We looked at the land first on the drive out about here (indicating) and then around on the railroad track, but didn't go down on this line of lot 17 at all, and nothing was said that I remember about that part of lot 17. * * * We walked along the driveway when I was showing Mr. Carpenter the property that I was selling him. We did not talk about the land on the east side."

Carpenter was not unfamiliar with that locality. He had put a new roof on the house, knew plaintiff lived on the adjoining lot across the driveway, that Bussard had bought his place of her and what he had agreed to pay for it. He looked the property over with a view to buying it and, it would seem, unavoidably saw the demarcation between Bussard's back lot and the portion of lot 17 to its east which was uncultivated, with trees and brush growing on it. Just what Bussard told him as to the amount he owned at the rear is in dispute. Carpenter's claim in this litigation is that he was an innocent purchaser in good faith as assignee of the vendee to a land contract.

Without further reviewing the testimony it is sufficient to say on that proposition that we concur in the following disposition of it by the learned circuit judge who heard the case:

"Defendant Carpenter insists he was misled by defendant Bussard regarding the description. Considering all the physical conditions, as defendant Carpenter must have seen them, together with all the facts and circumstances involved in the transaction and surrounding the two defendants at the time they visited the premises, the evidence preponderates, in my opinion, against defendant Carpenter."

The court further found that the defense urged could not prevail under the rule stated in *Stephens* v. *Coryell*, 169 Mich. 48, citing decisions in this State and elsewhere, that "The assignee of a contract of this

nature takes it subject to all the rights and equities existing between the original parties."

Neither plaintiff or Bussard knew of the inaccuracy in the description of the property until after Carpenter began a building on the part of lot 17 south of lot 3 in dispute here. Carpenter's claim that he was an innocent purchaser relying on the description in his contract is not convincingly sustained even by his own testimony, and is fairly refuted by admitted circumstances as well as Bussard's clear and positive testimony of facts to the contrary. He apparently early discovered the inaccuracy in description of what he had bargained for and confusion it led to in attempting to locate the driveway according to it. Asked regarding that feature of the description, he stated that he had consulted his attorney about it who told him they could not drive across his property but might drive around it. The attorney apparently took the description as it read, and naturally expressed doubts as to its giving a connected right of way to the railroad over the property described. Carpenter did not then or later mention this confusion in the description as to right of way either to his assignor or the holder of the title, although he had seen where the driveway ran and talked with Bussard about it, as he admits. Even if not exactly and clearly told by Bussard just where the line was, his own admissions of what he saw and was told about it in connection with what he discovered in the description was sufficient to put an ordinarily prudent and honestly confused man on inquiry. As assignee of this contract he did not acquire the legal title to any property it purported to convey. What he acquired was an equitable right of purchase subject to any equities existing between the original parties to it.

In the early New York case of *Murray* v. *Lylburn,* 2 Johns. Ch. 441, Chancellor Kent said of the reason

for this general rule that the assignee of a chose in action takes it subject to all equities between the original parties:

"The assignee can always go to the debtor, and ascertain what claims he may have against the bond, or other chose in action, which he is about purchasing from the obligee."

The decree will stand affirmed, with costs to plaintiff.

FELLOWS, C. J., and WIEST, McDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.